UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GARY W. TIPTON,

        Plaintiff,

  v.                                          Civil Action 2:20-cv-4843
                                               Judge Sarah D. Morrison
OHIOHEALTH GRADY MEMORIAL          Magistrate Judge Chelsey M. Vascura
HOSPITAL,

        Defendant.

## ORDER and REPORT AND RECOMMENDATION

Plaintiff, Gary W. Tipton, an incarcerated person who is proceeding *pro se*, brings this action against OhioHealth Corporation d/b/a Grady Memorial Hospital ("OhioHealth"), alleging that he suffered harm as a result of OhioHealth's violation of its duties pertaining to emergency-room screening and stabilization services under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.  This matter is before the Court for consideration of OhioHealth's Second Motion to Dismiss, which is fully briefed, and also a filing Plaintiff captions "Reply and Opposition," which the undersigned construes as a motion for leave to file a sur-reply.  (ECF Nos. 33–36.)  For the reasons that follow, Plaintiff's motion to file a sur-reply is **DENIED**, and it is **RECOMMENDED** that Defendant's Second Motion to Dismiss be **DENIED**.

## I. BACKGROUND

Plaintiff alleges that OhioHealth violated EMTALA when its emergency-room physician discharged him without adequately screening him or stabilizing his condition, while he was experiencing a suicidal episode and had two razorblades stuck in his stomach. (Pl.'s 2d Am. Compl., ECF No. 32.) At this stage of the case, the undersigned takes the following well-pleaded facts as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

According to the Second Amended Complaint, between January 24 and 25, 2020, Plaintiff made two suicide attempts, prompting prison staff to transport him out of the prison for medical care. (Pl.'s 2d Am. Compl. at ¶¶ 1–2, ECF No. 32.) As part of his suicide attempts, Plaintiff cut his wrists, lodged two razor blades in his stomach, and exhibited psychological distress, including "hitting himself in the face, trying to further his abdominal wound, [and] expressing that he would kill himself . . . ." (*Id.*) Prison staff initially took Plaintiff to The Ohio State University Wexner Medical Center, where physicians did not detect the razor blades using an x-ray, but then transported him to Marion General Hospital, where a CAT scan revealed the blades. (*Id.* at ¶ 2.) Marion General Hospital "kicked out" Plaintiff "for his suicidal behaviors,"[1] and in the prison transport van on the way out, Plaintiff retrieved one of the razor blades from his stomach and used that blade to further cut his abdomen and wrists. (*Id.* at ¶ 7.) This prompted prison staff to transport Plaintiff to a third hospital, Defendant OhioHealth, for emergency care. (*Id.* at ¶ 1.)

---

[1] Plaintiff's allegation is that "one hospital" "kicked [him] out." (2d Am. Compl. ¶ 2, ECF No. 32.) Based on the sequence of events in the Second Amended Complaint, and only for purposes of clarity in this Report and Recommendation, the undersigned infers that Plaintiff's reference to "one hospital" means Marion General Hospital.

When Plaintiff arrived at OhioHealth, emergency-room staff placed him in a hospital "safe room" because of his suicidality, and officers from the prison and from the Ohio State Highway Patrol sought treatment on his behalf. (*Id.* at ¶ 2.) An emergency-room physician examined Plaintiff and "noticed the severity of [his] injuries." (*Id.*) The physician attempted to transfer Plaintiff back to Wexner, but Wexner refused to accept the transfer. (*Id.* at ¶¶ 2, 5.) The physician then told Plaintiff that she planned to order an x-ray, and that if the x-ray did not demonstrate that there were razor blades lodged in his stomach, she would discharge him. (*Id.*) Medical records from Plaintiff's prior hospital visits referenced a "laceration" as deep as his "omentum."[2] (*Id.*) OhioHealth staff did not perform testing "to determine if Plaintiff had perforated any vital organs." (*Id.*) Throughout his visit, although Plaintiff was "hysterical," "crying out in severe pain," and threatening to kill himself, OhioHealth refused his repeated requests for psychiatric evaluation and care. (*Id.* at ¶¶ 2–3.)

Plaintiff further alleges that his emergency-room physician exhibited bias towards people with suicidal behaviors, citing several comments she made. For example, Plaintiff alleges that the physician stated that "she didn't agree with suicidal behaviors and felt other people were deserving of her[] time." (*Id.* at ¶¶ 3–4, 6.) After making such statements, the physician attempted to transfer or discharge Plaintiff. (*Id.* at ¶¶ 4–5.) But when the prison staff escorting Plaintiff "expressed their concerns in regards to discharging" him, the emergency-room physician "agreed to explore Plaintiff's abdominal cavity with hospital hemostats." (*Id.* at ¶ 7.) In doing so, the physician discovered one of the two razor blades Plaintiff alleges were embedded in his abdomen. (*Id.*) According to Plaintiff, because the physician was unable to

---

[2] The omenta are folds of tissue enclosing the internal organs in the abdomen. "Abdominal cavity," Encyclopedia Britannica, Mar. 27, 2017, https://www.britannica.com/science/abdominal-cavity.

3

retrieve the razor blade, she handed hemostats to Plaintiff so that he could remove the blade. (*Id.*) Plaintiff then began stabbing himself with the hemostats, pulled one of the razor blades out of his stomach, and argued with the physician and the prison guards while refusing to let go of those items. (*Id.*) At that point, the physician left the safe room and returned with discharge papers, and Plaintiff was physically removed from the hospital against his will, still bleeding and shouting. (*Id.* at ¶¶ 7–8.)[3]

In every paragraph of his Second Amended Complaint, Plaintiff alleges that he was suicidal or that he was physically or verbally expressing his suicidality and his intention to hurt himself, and he repeatedly alleges that OhioHealth staff knew this. (*Id., passim.*) Plaintiff alleges that at the time of filing the Second Amended Complaint, he was still experiencing severe abdominal pain, as well as numbness and lack of mobility in his left hand, attributable to OhioHealth's conduct. (*Id.* at ¶ 9.) Plaintiff alleges that a January 30, 2020 x-ray, taken at an Ohio prison, demonstrated that the razor blade left behind upon his discharge from OhioHealth remained in his abdomen. (*Id.* at ¶ 10.)

OhioHealth filed the subject Second Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff's entire Second Amended Complaint fails to state a claim upon which relief can be granted and also that should Plaintiff's EMTALA claims survive, his claim for punitive damages should be stricken. (ECF No. 33.) Plaintiff filed a Memorandum in Opposition, OhioHealth filed a Reply, and the Motion is ripe for review. (ECF Nos. 34, 35.)

---

[3] A typo in Plaintiff's Second Amended Complaint (ECF No. 32) numbers two consecutive paragraphs as ¶ 7. This Report and Recommendation refers to the second instance of ¶ 7 as actual ¶ 8, what is listed as ¶ 8 as actual ¶ 9, and so forth.

## II. STANDARD OF REVIEW

A claim survives a Rule 12(b)(6) motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 544, 555 (2007) (internal citations omitted).

A court must "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The plaintiff, though, must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007). "[A] naked assertion . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility . . . ." *Twombly*, 550 U.S. at 557.

Finally, a *pro se* pleading like Plaintiff's here must be "liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106, (1976); *Williams v. Curtin,* 631 F.3d 380, 383 (6th Cir. 2011). Courts review *pro se* pleadings using "less stringent standards than formal pleadings drafted by lawyers." *Id.* (citing *Martin v. Overton,* 391 F.3d 710, 712 (6th Cir. 2004)).

### III. ANALYSIS

#### A. Plaintiff's Motion to File a Sur-Reply

On August 19, 2021, after the subject Second Motion to Dismiss had been fully briefed, Plaintiff deposited in the prison mail system a filing he captions "Reply and Opposition to Defendant's Motion to Dismiss." (ECF No. 36.) But Plaintiff had already filed his Opposition to the Second Motion to Dismiss (ECF No. 34) such that it appears that Plaintiff was seeking to instead file a sur-reply to address Defendant's August 5, 2021 Reply (ECF No. 35). Southern District of Ohio Local Civil Rule 7.2 (a)(2) contemplates only opposing and reply memoranda and states that "[n]o additional memoranda . . . are permitted except upon leave of court for good cause shown." Consequently, the Court construes Plaintiff's filing as seeking leave to file a sur-reply. Because Plaintiff has failed to demonstrate good cause for filing such a sur-reply, the motion is **DENIED**, and the undersigned has not considered this filing in connection with issuing this Report and Recommendation.

#### B. OhioHealth's Second Motion to Dismiss

OhioHealth moves to dismiss Plaintiff's Second Amended Complaint in its entirety, but it construes Plaintiff's Second Amended Complaint as advancing only an EMTALA stabilization claim and therefore neglects to consider whether Plaintiff has sufficiently alleged an EMTALA screening claim. (Def.'s Mot. 4, ECF No. 33 (describing the Second Amended Complaint as "inartful").) Construing the *pro se* pleadings liberally and in the light most favorable to Plaintiff, *Overton,* 391 F.3d at 712, the undersigned finds that Plaintiff advances both types of EMTALA claims. The undersigned therefore first considers whether Plaintiff has plausibly alleged an

6

EMTALA stabilization claim before considering his screening claim, and last, considers Defendant's assertion that Plaintiff's demand for punitive damages must be stricken.

### 1. The Two Types of EMTALA Claims

Congress enacted EMTALA to prevent "patient dumping," instances where for non-paying patients, hospital emergency rooms either "failed to provide medical screening" or "transferred or discharged a patient without taking steps that would have been taken for a paying patient." *Cleland v. Bronson Health Care Grp., Inc.,* 917 F.2d 266, 268 (6th Cir. 1990). The statute imposes the following obligations on hospitals with emergency rooms:

> (1) To provide "an appropriate medical screening examination within the capability of the hospital's emergency department" to "any individual [who] comes to the emergency department" and seeks examination or treatment. 42 U.S.C. § 1395dd(a).
>
> (2) If the "hospital determines that the individual has an emergency medical condition," to stabilize the medical condition before transferring (or discharging) a patient. 42 U.S.C. § 1395dd(b)(1) and (c)(1).

*Id.* In other words, EMTALA "impose[s] two sets of duties on hospitals,"

> [O]ne set coming from section (a) (the medical screening provision) and the other coming from the interplay of sections (b)(1) and (c)(1) (the stabilization and the transfer-restriction provisions). [*Cleland,* 917 F.2d] at 268. Our later cases have also treated section (a) as creating liability for failing to appropriately screen patients, and sections (b) and (c) as together regulating treatment and restricting transfer of emergency patients. *See, e.g., Cherukuri v. Shalala*, 175 F.3d 446, 450 (6th Cir. 1999).

*Roberts ex rel. Johnson v. Galen of Va., Inc.,* 325 F.3d 776, 786 (6th Cir. 2003).

In the United States Court of Appeals for the Sixth Circuit, to prove a screening claim under EMTALA section (a), a plaintiff must demonstrate that the hospital failed to provide the plaintiff the same level of screening it would have provided to any other patient. *Cleland,* 917 F.2d at 268. A hospital may be liable if its screening is "nonexistent or substandard . . . for any reason (including, without limitation, race, sex, politics, occupation, education, personal prejudice, drunkenness, spite, etc.)." *Estate of Lacko ex rel. Griswatch v. Mercy Hosp., Cadillac,*

7

829 F. Supp. 2d 543, 548 (E.D. Mich. 2011) (quoting *Cleland,* 917 F.2d at 272). An EMTALA screening claim therefore requires demonstration of (1) nonexistent or substandard screening and (2) motive. *Id* at 550–51. To prove a stabilization claim under EMTALA sections (b) and (c), a plaintiff must demonstrate that the hospital (1) had actual knowledge of his emergency medical condition and (2) discharged him without stabilizing it. *Cleland,* 917 F.2d. at 269.

Finally, for both screening and stabilization claims under EMTALA, a plaintiff must show a causal link between the hospital's alleged violations and the harm suffered. More specifically, a plaintiff must show "personal harm" that is a "direct result" of the hospital's EMTALA violation, as contrasted with harm attributable to the underlying condition for which the plaintiff initially sought treatment. *See* 42 U.S.C. § 1395dd(2)(a).

### 2. Plaintiff's Stabilization Claim Under EMTALA Sections (b) and (c)

#### a. Whether OhioHealth Determined Plaintiff had an Emergency Condition

OhioHealth first posits that its staff had not "determined" that Plaintiff had an "emergency medical condition" as contemplated under EMTALA. (Def.'s Mot. 6–7, ECF No. 33; *see also* Def.'s Reply at ¶ 3, ECF No. 35.) An "emergency medical condition" exists where the patient has severe symptoms such that the absence of immediate medical attention could reasonably be expected to result in: (1) placing the patient's health in serious jeopardy, (2) serious impairment to bodily functions, or (3) serious dysfunction of any bodily organ or part. 42 U.S.C. § 1395dd(e)(1). In general, "a mental health emergency could qualify as an 'emergency medical condition'" under EMTALA. *Moses v. Providence Hosp. and Med. Ctrs., Inc.,* 561 F.3d 573, 585 (6th Cir. 2009); *see also Estate of Lacko,* 829 F. Supp. 2d at 552. To have "determined" that a patient has an emergency condition that triggers EMTALA requires the hospital's actual knowledge of the condition. *Roberts,* 325 F.3d at 786–88. This does not

8

require a physician's diagnosis; rather, any hospital employee's actual knowledge of the condition opens the door to liability. *Id.* But if the hospital staff either do not know, or "do not believe an emergency medical condition exists because they wrongly diagnose the patient, EMTALA does not apply." *Moses,* 561 F.3d at 585.

Taking his factual allegations as true, Plaintiff sufficiently pleads that OhioHealth had actual knowledge that he had an emergency condition within the meaning of EMTALA. Plaintiff alleges that he was suicidal, exhibiting self-harming and unstable behaviors, and bleeding, all of which prompted OhioHealth to place him in a "safe room." He further alleges that he and prison officials repeatedly told OhioHealth staff that he was suicidal and that records from hospital visits from the prior 48 hours corroborated his emergency condition. Finally, Plaintiff alleges that OhioHealth's emergency-room physician exhibited bias towards him *because* of his emergency suicidal condition. (*See* 2d Am. Compl. at ¶¶ 2–6, ECF No. 32; *see also* Pl.'s Opp'n 1–2, ECF No. 34 (alleging that the physician stated that "she didn't agree with suicidal behaviors and felt other people were deserving of her[] time" and that "E.D. had complete knowledge of a[n] emergency medical condition, expressed her biasness towards suicidal behaviors").

### b. Whether OhioHealth "Stabilized" Plaintiff's Emergency Condition

OhioHealth next argues that even if it "determined" that Plaintiff had an emergency medical condition, Plaintiff fails to plausibly allege that OhioHealth failed stabilize that condition. In support, OhioHealth asserts that the Second Amended Complaint contains "no allegations that there was a 'material deterioration'" of Plaintiff's condition after discharge, adding that Plaintiff was, in fact, "provided with medical care and treatment" for his suicidality. (ECF No. 33 at 8.)

9

The undersigned concludes that Plaintiff sufficiently alleges that OhioHealth failed to stabilize his condition prior to discharge. "To stabilize" under EMTALA is "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . ." 42 U.S.C. § 1395dd(e)(3)(A). Here, Plaintiff alleges that he was discharged with a razor blade still lodged into his stomach; that upon discharge, he was suicidal, screaming, bleeding, and experiencing pain; and that he continued to experience "severe abdominal pain," as well as loss of mobility through the time of filing the Second Amended Complaint. (ECF No. 32 at ¶¶ 8–10.) Accepted as true, these allegations establish that OhioHealth discharged Plaintiff before stabilizing his mental and physical conditions.

### c. Causation

OhioHealth last argues that Plaintiff's stabilization claim fails because he has failed to sufficiently allege causation under EMTALA. As set forth above, a plaintiff must show "personal harm" that is a "direct result" of the hospital's EMTALA violation. 42 U.S.C. § 1395dd(2)(a). Because an EMTALA plaintiff must show that the harm alleged is caused by the EMTALA violation and not the underlying medical emergency, expert testimony is often required. *See, e.g., Scott v. Mem'l Health Care Sys., Inc.,* 660 F. App'x 366, 372–73 (6th Cir. 2016); *but see*, *e.g.*, *Runnells v. Rogers*, 596 S.W.2d 87 (Tenn. 1980) (no expert testimony needed to show causation where hospital neglected to remove wire embedded from swollen and infected foot).

Applied here, Plaintiff sufficiently alleges a causal link between the harm he suffered and OhioHealth's alleged EMTALA violations. In particular, Plaintiff alleges that as a result of

10

OhioHealth's failure to screen and/or stabilize him, he suffered physical harm, including damage to his hand and continued/exacerbated abdominal pain attributable to OhioHealth's failure to remove the razor blade lodged in his stomach.

### 3. Plaintiff's Screening Claim Under EMTALA Section (a)

The undersigned concludes that Plaintiff sufficiently alleges a screening claim under EMTALA. In the Sixth Circuit, a failure-to-screen claim requires a threshold allegation of motive. *Elmhirst,* 726 F. App'x at 442–43. The motive element does not require plaintiffs to allege that a hospital "dumped" them because of inability to pay or require any other protected-class type of showing, but rather requires an allegation of bias on *any* basis—even interpersonal dislike. *Id.* Here, as discussed above, Plaintiff alleges that the emergency-room physician failed to adequately screen him because of her "personal bias-ness towards people who indulge in suicidal behaviors." (2d Am. Compl. at ¶¶ 2–6, ECF No. 32.) Plaintiff also alleges that despite his requests for treatment and his evident condition, the hospital refused to provide him any psychiatric screening or care and also refused to perform any testing related to his physical injuries. (*Id.*) Taken as true, these facts are sufficient to establish that OhioHealth had motive, and did, fail to provide Plaintiff the same level of screening as a standard patient might receive. *See Cleland,* 917 F.2d at 268.

### 4. OhioHealth's Motion to Strike Plaintiff's Punitive Damages Claim

Finally, OhioHealth asks this Court to strike Plaintiff's demand for punitive damages. (ECF No. 33 at 11.) EMTALA's private right of action authorizes patient recovery against a hospital for "damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(2)(A). Ohio's personal injury damages statute, Ohio Revised Code § 2315.21, authorizes punitive

damages, capped at double compensatories, if (1) the defendant acted with "malice or aggravated or egregious fraud," or "knowingly authorized, participated in, or ratified" such behavior by its agent, and (2) a jury awards compensatory damages. Ohio Rev. Code § 2315.21(c)(1). Under Ohio law, to show malice, because "punitive damages are assessed for punishment and not compensation, a positive element of conscious wrongdoing is always required." *Preston v. Murty,* 32 Ohio St.3d 334, 512 N.E.2d 1174, 1176 (1987). "In other words, a plaintiff must show something more than mere negligence." *Tsirikos-Karapanos v. Ford Motor Co.,* 2017-Ohio-8487, 99 N.E.3d 1203, ¶ 43 (Ohio Ct. App. 2017); *see also Bell v. Zurich Am. Ins. Co.*, 156 F. Supp. 3d 884, 891 (N.D. Ohio 2015) ("malice" under the Ohio statute includes "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm" (internal citations omitted) (punitive damages awarded for tortious failure to investigate life insurance claim)); *Freudeman v. Landing of Canton,* 702 F.3d 318, 331 (6th Cir. 2012) (punitive damages upheld in medical negligence and wrongful death suit based on conscious-disregard showing of malice). At the pleading stage, a plaintiff need not specifically demand punitive damages, but must allege sufficient facts from which the essential elements of malice may be inferred. *Patel v. Zervas,* No. 2:13CV499, 2013 WL 6504695, at *3 (S.D. Ohio Dec. 10, 2013) (citing cases).

  Here, as detailed above, Plaintiff alleges that OhioHealth's staff knowingly, and on the basis of bias, discharged him from the emergency room without adequate screening and/or without stabilizing his condition, forcing him to leave the hospital while bleeding and trying to harm himself. Taking these allegations as true, and without considering additional evidence at this phase of the proceedings, Plaintiff pleads facts upon which a jury could rely to conclude that OhioHealth acted with conscious disregard for Plaintiff's rights or safety. Thus, it is

12

recommended that Defendant's request to strike Plaintiff's demand for punitive damages be denied.

## IV.  DISPOSITION

For the reasons set forth above, Plaintiff's motion seeking leave to file a sur-reply (ECF No. 36) is **DENIED**, and it is **RECOMMENDED** that the Court **DENY** Defendant's Second Motion to Dismiss.  (ECF No. 33.)

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A Judge of this Court shall make a *de novo* determination of those portions of the Report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE