UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GARY W. TIPTON,

    **Plaintiff,**

    v.                          Civil Action 2:20-cv-4843
                                  Judge Sarah D. Morrison
OHIOHEALTH GRADY MEMORIAL     Magistrate Judge Chelsey M. Vascura
HOSPITAL,

    **Defendant.**

## ORDER and REPORT AND RECOMMENDATION

Plaintiff, Gary Tipton, an Ohio inmate who is proceeding without the assistance of counsel, brings this action against Defendant, OhioHealth Corporation d/b/a Grady Memorial Hospital, under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. This matter is before the Court on Plaintiff's Motion for Zoom Conference, Motion to Appoint Counsel, Motion to Appoint Medical Expert, Motion for Additional Discovery under Federal Rule of Civil Procedure 56(d), and Motion to Compel Further Discovery Responses, as well as Defendant's Motion for Summary Judgment. For the reasons that follow, Plaintiff's Motions (ECF Nos. 68, 69, 80) are **DENIED,** and it is **RECOMMENDED** that Defendant's Motion for Summary Judgment (ECF No. 62) be **GRANTED**.

## I.     PLAINTIFF'S MOTIONS

Plaintiff has made several miscellaneous motions antecedent to his response to Defendant's Motion for Summary Judgment. For the following reasons, all of Plaintiff's Motions are **DENIED**.

### A.     Motion for Zoom Conference

Plaintiff seeks a Zoom conference to discuss his motion to appoint counsel, motion to appoint a medical expert, and objection to one of the undersigned's previous orders. (ECF No. 68, PAGEID #811.) The Court does not find a conference would be necessary or helpful in reaching its decisions. Accordingly, Plaintiff's Motion for Zoom Conference is **DENIED**.

### B.     Motion to Appoint Counsel

This is Plaintiff's third motion to appoint counsel after his first two such motions were denied. (*See* ECF Nos. 11, 19.) Plaintiff contends that exceptional circumstances justify appointment of counsel because he was recently transferred to a different prison, he is not mentally competent to litigate the case, he is dealing with additional medical issues including an upcoming hernia surgery, and Plaintiff has limited access to a law library. (ECF No. 68, PAGIED #803–08.)

Although this Court has the statutory authority under 28 U.S.C. § 1915(e) to appoint counsel in a civil case, appointment of counsel is not a constitutional right. *Lavado v. Keohane*, 992 F.2d 601, 605–06 (6th Cir. 1993) (citation omitted). Rather, "[i]t is a privilege that is justified only by exceptional circumstances." *Id.* at 606. The Court has evaluated whether such exceptional circumstances exist and determines that the appointment of counsel is not warranted at this juncture. Plaintiff's transfer to a different facility and limited access to a law library are commonplace circumstances for inmates and cannot be considered "exceptional." Further, Plaintiff has demonstrated through his numerous and detailed filings that he is not mentally or

medically prevented from litigating this case. Accordingly, Plaintiff's Motion to Appoint Counsel (ECF No. 68, PAGIED #803–08) is **DENIED**.

C.       **Motion to Appoint Medical Expert**

Plaintiff contends that the Court should appoint a medical expert to testify on his behalf due to the case's complexity and due to caselaw holding that medical expert evidence is necessary to establish certain elements of EMTALA claims. (ECF No. 68, PAGEID #811–12.)

The undersigned finds no grounds to appoint a medical expert on Plaintiff's behalf in this case. Neither the First Amendment right of access to courts, nor the federal *in forma pauperis* statute, nor Federal Rule of Evidence 706 provides *pro se* plaintiffs with the right to appointment of a medical expert. *See, e.g.*, *Johnson v. Hubbard*, 698 F.2d 286, 288–90 (6th Cir. 1983) (neither an inmate's right of access to the courts nor 28 U.S.C. § 1915 entitles him to have the public fund his general litigation expenses, such as witness fees); *Tipton v. Core Civic of Am.*, No. 1:20-CV-02346, 2021 WL 3288581, at *1 (N.D. Ohio Aug. 2, 2021) ("An expert appointed pursuant to Rule 706 does not serve as an advocate for either party, and each party retains the ability to call its own experts.") (quoting *Patton v. Loadhold*, 445 F. Supp. 3d 802, 803 (E.D. Cal. 2020)); *Stevens v. Stieve*, No. 1:13-CV-918, 2018 WL 10688349, at *2 (W.D. Mich. Dec. 9, 2018) ("Like all other civil litigants, plaintiff must pay his own litigation expenses."). Accordingly, Plaintiff's Motion to Appoint Medical Expert (ECF No. 68, PAGEID #811–12) is **DENIED**.

D.       **Motion for Additional Time to Conduct Discovery**

Plaintiff asserts that he requires additional time to complete discovery before responding to Defendant's Motion for Summary Judgment. (ECF No. 69.) The undersigned therefore construes this as a motion under Federal Rule of Civil Procedure 56(d) for time to take additional discovery before responding to a summary judgment motion. The United States Court of Appeals

for the Sixth Circuit has outlined the following factors for trial courts to consider in evaluating a motion under Rule 56(f):

> (1) when the [movant] learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the [summary judgment] ruling [ ]; (3) how long the discovery period had lasted; (4) whether the [movant] was dilatory in its discovery efforts; and (5) whether the [non-movant] was responsive to discovery requests.

*Doe v. City of Memphis*, 928 F.3d 481, 491 (6th Cir. 2019) (quoting *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995)).

As grounds for additional time to conduct discovery, Plaintiff states that he only recently received Defendant's responses to his written discovery requests, and those responses are deficient, requiring him to move to compel supplemental responses; that he did not realize an extension to conduct discovery had already been granted due to a recent facility transfer; that he is awaiting discovery responses from Defendant's medical expert, Dr. Brian Zink, M.D., as well as several corrections officers; and that Defendant has not yet produced the hospital policies that the undersigned ordered Defendant to produce in response to Plaintiff's previous motion to compel. (*Id.*)

In response, Defendant states it does not oppose additional time for Plaintiff to file his memorandum in opposition, but contends that Defendant has now fully responded to Plaintiff's discovery requests, including serving the compelled hospital policies, and that Defendant is unaware of any discovery served on Dr. Zink or corrections officers. Plaintiff did not file a reply to dispute any of Defendant's contentions.[1]

Further, the undersigned finds this motion to be moot, as Plaintiff has already filed his memorandum in opposition to Defendant's Motion for Summary Judgment. (ECF No. 82.)

---

[1] Plaintiff did file a subsequent motion to compel supplemental responses to Defendant's discovery requests. (ECF No. 80.) However, as discussed below, that motion lacks merit.

4

Although his memorandum in opposition contends that the memorandum is incomplete because Plaintiff has not had the chance to obtain a medical expert (*id.* at PAGEID #932), the undersigned has denied Plaintiff's request for the Court to appoint a medical expert for him, and his filings assert he has no other way of obtaining one; thus, additional time would be of no aid to Plaintiff on this point. Moreover, although Plaintiff's memorandum in opposition further contends that Defendant did not disclose its retention of Dr. Zink as a medical expert in time for Plaintiff to propound discovery requests on him (*id.*), the record does not bear out this contention. Defendant filed its Motion for Summary Judgment (relying on the testimony of Dr. Zink) on May 9, 2022 (ECF No. 62); on May 10, 2022, the Court extended discovery to June 10, 2022, and Plaintiff's deadline to file his opposition to Defendant's Motion for Summary Judgment to June 24, 2022 (ECF No. 64); Plaintiff raised his lack of discovery from Dr. Zink in his motion for additional time to conduct discovery on May 27, 2022 (ECF No. 69); Defendant asserted that no discovery had been served on Dr. Zink in its opposition to that motion on June 7, 2022 (ECF No. 72), and Plaintiff filed his memorandum in opposition to Defendant's Motion for Summary Judgment on June 30, 2022 (ECF No. 82). Nowhere in the almost two-month period between Defendant's Motion for Summary Judgment and Plaintiff's memorandum in opposition does the record reflect that Plaintiff even attempted to serve discovery requests on Dr. Zink. Finally, as discussed below, the undersigned's summary judgment recommendation does not turn on Dr. Zink's testimony, such that allowing Plaintiff to serve discovery requests on Dr. Zink would not change the outcome. Accordingly, after consideration of the factors laid out in *Plott*, 71 F.3d at 1196–97, the undersigned **DENIES** Plaintiff's motion for additional discovery under Rule 56(d) (ECF No. 69).

### E. Motion to Compel Further Discovery Responses from Defendant

Although Plaintiff captions this filing as a Motion to Compel, the bulk of the filing comprises only Plaintiff's dissatisfaction with Defendant's general objections asserted in response to Plaintiff's discovery requests. (ECF No. 80.) Plaintiff does not contend that any particular responses are deficient. Indeed, having reviewed Defendant's responses, the undersigned finds that Defendant provided sufficient responses, notwithstanding its general and individual objections. (*See* Def.'s Resps., ECF No. 80, PAGEID #890–912.) Moreover, Plaintiff does not contend that he attempted to exhaust extrajudicial means of resolving this discovery dispute before filing a motion, which is required by this Court's Local Rules. S.D. Ohio Civ. R. 37.1. Accordingly, Plaintiff's Motion to Compel (ECF No. 80) is **DENIED**.

The undersigned accordingly proceeds to consider Defendant's Motion for Summary Judgment.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Background

Plaintiff alleges that Defendant violated EMTALA when its emergency-room physician discharged him without adequately screening him or stabilizing his condition, while he was experiencing a suicidal episode and had razorblades embedded in his abdomen. The parties' accounts of the relevant facts differ somewhat.

#### 1. Plaintiff's Account[2]

According to Plaintiff, an inmate incarcerated at Marion Correctional Institution ("MCI"), he attempted suicide on January 16, 2020, by lacerating his abdomen. (Tipton Decl.

---

[2] Plaintiff's account is taken from his Second Amended Complaint (ECF No. 32) and declaration included with his memorandum in opposition (ECF No. 82), both of which were verified under penalty of perjury in compliance with 28 U.S.C. § 1746. Plaintiff also filed a "Response to Defendant's Reply Brief" (ECF No. 89). This filing does not contain any factual averments made

6

¶ 5, ECF No. 82.) He was transported from MCI to the Ohio State University Wexner Medical Center ("OSU") for emergent surgery to remove a foreign body from his abdomen. (*Id.*) A few days after returning to MCI, on January 24, 2020, Plaintiff again attempted suicide by using razor blades to open his surgical incision and inserting three razor blades into his abdomen. (*Id.* at ¶¶ 5–6.) Plaintiff was then transported to Marion General Hospital, where emergency-room staff obtained a CAT scan reflecting a foreign body. (*Id.* at ¶ 6.) The Marion General staff determined that Plaintiff should be transferred to OSU for a surgery consult and stabilization, given his recent surgery there. (*Id.*) Once at OSU, Plaintiff avers that he used his hand to extract one of the three razor blades from his abdomen, placed the razor blade in his mouth, and hid the blade inside his cheek. (*Id.*) Over Plaintiff's vehement objections, he was discharged from OSU after an x-ray revealed no foreign bodies. (*Id.*)

While being transported back to MCI in the early hours of January 25, 2020, Plaintiff "removed a razor" (Plaintiff does not specify whether this razor was removed from his abdomen or from inside his cheek) and cut both of his wrists and cut "a very deep laceration" his abdomen, which once again opened his surgical incision. (*Id.*) The MCI officers escorting Plaintiff decided he once again needed emergency medical treatment and had him transported via ambulance to Defendant OhioHealth Grady Memorial Hospital. (*Id.*)

Upon arrival at Grady Memorial, emergency-room personnel placed Plaintiff in a "safe room." (*Id.* at ¶ 8.) Plaintiff was then examined by Dr. Dawn Prall, M.D., who initially determined Plaintiff should be transferred back to OSU. (*Id.*) However, OSU denied the transfer.

---

under penalty of perjury and constitutes an impermissible sur-reply in violation of this Court's Local Rules. *See* S.D. Ohio Civ. R. 7.2(a)(2). Accordingly, the undersigned has not considered Plaintiff's Response to Defendant's Reply Brief in connection with Defendant's Motion for Summary Judgment.

(*Id.*) Dr. Prall then ordered an x-ray, which revealed no foreign body, and expressed an intent to discharge Plaintiff. (*Id.*) Plaintiff then stated that if Dr. Prall did not remove the remaining two razor blades from his abdomen, he would dig them out and kill himself with them. (*Id.*) At this point, Plaintiff contends that Dr. Prall expressed bias against suicidal patients, stating that Plaintiff "was only doing this to seek attention," that she "doesn't agree with suicide," and that "other patients were more deserving and in need of her time." (*Id.* at ¶ 9.)

Dr. Prall then re-examined Plaintiff's abdomen, located one of the razor blades, and attempted to remove it, but was unable or unwilling to do so. (*Id.* at ¶ 10.) After Plaintiff again implored her to remove the blade, lest he remove it himself and attempt suicide again, Plaintiff contends that Dr. Prall instructed prison employees to remove Plaintiff's handcuffs and said, "if he knows where it is, let him get it." (*Id.*) Dr. Prall then handed Plaintiff a pair of hemostats, which he used to "stab[ ] himself" in his surgical incision, causing it to "pour[ ] blood." (*Id.*) Plaintiff alleges that when he "finally handed [an MCI corrections officer] the [hemostats], one of the razors were clamped to it." (*Id.*)

Plaintiff contends that Dr. Prall was "livid" and said, "get him out of my emergency room." (*Id.*) Plaintiff stated he still had one razor blade embedded in his abdomen and refused to leave until he was seen by hospital psychiatric staff. (*Id.* at ¶ 11.) Plaintiff rejected Dr. Prall's suggestion that he speak to MCI mental health staff, as they would not be available until the following day and he would kill himself before making it back to the prison. (*Id.*) Finally, after a nurse dressed his wrist lacerations and a second x-ray was inconclusive as to the presence of any remaining foreign bodies, Dr. Prall discharged Plaintiff, again over his vehement objections. (*Id.*) Plaintiff alleges that as he left, he was still bleeding from his abdominal wound. (Pl.'s 2d Am. Compl. ¶ 7, ECF No. 32.)

8

Following discharge from Grady Memorial, Plaintiff returned to MCI where he continued to experience abdominal pain and difficulty with using his hands and wrists. (Tipton Decl. ¶¶ 13–14, ECF No. 82; Pl.'s 2d Am. Compl. ¶ 8, ECF No. 32.) Plaintiff states that, after yet another suicide attempt on January 30, 2020 (five days after his discharge from Grady Memorial), an x-ray at MCI confirmed that a razor blade remained in his abdomen. (*Id.*)

### 2. Defendant's Account

Citing OSU medical records, Defendant contends that Plaintiff presented to OSU with a foreign object in his abdomen and also reportedly swallowed a foreign object. (OSU Records 6, ECF No. 62-2.) When he was about to be discharged, Plaintiff became agitated, removed a foreign object from his wound, and swallowed the foreign objection in front of OSU staff. (*Id.* at 10.) An x-ray revealed the presence of a foreign object in the left upper quadrant of Plaintiff's abdomen. (*Id.*) Following consultation with a surgeon, it was determined that Plaintiff was not a surgical candidate (with the surgeon noting that the foreign object "should pass spontaneously") and he was discharged from OSU in stable condition. (*Id.* at 10, 15.)

Defendant does not dispute that Plaintiff engaged in self-harming behavior during his transport from OSU to MCI and that he was consequently diverted to Grady Memorial via ambulance. (Def.'s Mot. 3, ECF No. 62.) Grady Memorial medical records reflect that Plaintiff was initially assessed by Amy Zoller, RN, to whom Plaintiff reported that, while en route from OSU to MCI, he removed two razors from his abdominal wound, used them to lacerate his wrists and abdomen, and swallowed one of the razors. (Grady Memorial Records 11, ECF No. 62-6.) Courtney Roche, RN, then obtained an abdominal x-ray, cleaned and dressed Plaintiff's abdominal and wrist lacerations, and provided him with Tylenol. (*Id.* at 11–12.) Ms. Roche noted that Plaintiff was in handcuffs, had four prison staff members present at his bedside at all times, and was "calm and cooperative." (*Id.*)

9

Dr. Prall then examined Plaintiff. According to her notes, the x-ray revealed a "1.1 x 2.2cm opaque foreign body and adjacent surgical clips . . . in the anterior abdominal wall corresponding to foreign body, calcifications, and surgical clips seen in this region on CT evaluation" but that "[a]dditional sign of intraabdominal foreign body is not evident" and "[i]ntraabdominal foreign body is not confirmed." (*Id.* at 3.) Dr. Prall then spoke with the OSU surgeon that had just seen Plaintiff and he agreed that discharge back to MCI was most appropriate. (*Id.* at 3.) Dr. Prall then spent some time talking with Plaintiff about managing his stress and coping with life's challenges. (*Id.*) Plaintiff disclosed that he was being visited daily by a mental health professional, and Dr. Prall encouraged him to talk with his team about stress management and coping skills. (*Id.*) Dr. Prall performed an abdominal examination, which was benign. (*Id.*)

Dr. Prall was about to discharge Plaintiff when he told her that he still had a razor blade embedded in his skin. (*Id.*) Plaintiff "did indeed pull on a very small approximately 4 x 5 mm razor blade with the help of hemostats and retraction by [Dr. Prall]. This did not show up on xray. He removed it with some difficulty and with help by [Dr. Prall]." (*Id.*) Dr. Prall avers that she never made disparaging remarks about suicide or suicidal patients (Prall Aff. ¶ 9, ECF No. 62-4) and that Plaintiff did not injure himself while removing the razor blade with hemostats (*id.* ¶ 15).

After Plaintiff and Dr. Prall removed the razor blade from his abdomen, a second abdominal x-ray reflected "an approximately 1cm foreign body in the right upper abdomen which is not seen previously but may be external to the patient." (Grady Memorial Records 16, ECF No. 62-6.) This foreign body was "seen on the AP but not on the lateral view." (*Id.* at 16–17.) Dr. Prall's affidavit states that this second x-ray was "inconclusive regarding the presence of

10

a foreign object in his abdomen." (Prall Aff. ¶ 16, ECF No. 62-4.) Dr. Prall further avers that she considered two possibilities: first, that the foreign object was what Plaintiff had swallowed while at OSU, in which case Dr. Prall agreed with the OSU surgeon that the object would pass spontaneously; and second, that this was a separate foreign object located far within Plaintiff's soft tissue within the abdominal wall, in which case "the object was too far from the wound edge to be reasonably and safely retrievable, and the risk of further injury to Plaintiff in retrieving the object did not outweigh the benefits." (*Id.*) Dr. Prall's affidavit continues: "Regardless, it was my opinion, after assessing all of the facts and circumstances, including my examination of Plaintiff and his abdomen, that the presence of this foreign object would not place Plaintiff in any emergent physical danger or harm." (*Id.*) After performing a second abdominal examination, which was again benign, Dr. Prall discharged Plaintiff in stable condition from both a medical and mental health standpoint. (Grady Memorial Records 3, ECF No. 62-6; Prall Aff. ¶¶ 17–19, ECF No. 62-4.) Dr. Prall determined that at that time, he was not in any immediate danger of harming himself or others. (Prall Aff. ¶ 19, ECF No. 62-4.)

**B.      Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the court may "consider the fact undisputed for purposes of the motion").

The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

**C.     Analysis**

Congress enacted EMTALA to prevent "patient dumping," instances where for non-paying patients, hospital emergency rooms either "failed to provide medical screening" or "transferred or discharged a patient without taking steps that would have been taken for a paying patient." *Cleland v. Bronson Health Care Grp., Inc.,* 917 F.2d 266, 268 (6th Cir. 1990). The statute imposes the following obligations on hospitals with emergency rooms:

> (1) To provide "an appropriate medical screening examination within the capability of the hospital's emergency department" to "any individual [who] comes to the emergency department" and seeks examination or treatment. 42 U.S.C. § 1395dd(a).
>
> (2) If the "hospital determines that the individual has an emergency medical condition," to stabilize the medical condition before transferring (or discharging) a patient. 42 U.S.C. § 1395dd(b)(1) and (c)(1).

*Id.* In other words, EMTALA "impos[es] two sets of duties on hospitals":

> [O]ne set coming from section (a) (the medical screening provision) and the other coming from the interplay of sections (b)(1) and (c)(1) (the stabilization and the transfer-restriction provisions). [*Cleland,* 917 F.2d] at 268. Our later cases have also treated section (a) as creating liability for failing to appropriately screen patients, and sections (b) and (c) as together regulating treatment and restricting transfer of emergency patients. *See, e.g., Cherukuri v. Shalala*, 175 F.3d 446, 450 (6th Cir. 1999).

*Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 786 (6th Cir. 2003).

Plaintiff advances both screening and stabilization claims under EMTALA. The undersigned considers each claim in turn.

### 1. Screening Claim

To succeed on an EMTALA screening claim under section (a), a plaintiff must prove that the hospital failed to provide the plaintiff the same level of screening it would have provided to any other patient. *Cleland,* 917 F.2d at 268. A hospital may be liable if its screening is "substandard (by its standards) or nonexistent . . . for any reason (including, without limitation, race, sex, politics, occupation, education, personal prejudice, drunkenness, spite, etc.)." *Id.* at 272. An EMTALA screening claim therefore requires demonstration of (1) substandard or nonexistent screening and (2) improper motive. *Estate of Lacko ex rel. Griswatch v. Mercy Hosp., Cadillac*, 829 F. Supp. 2d 543, 548 (E.D. Mich. 2011) (citing *Cleland*, 917 F.2d at 272). Finally, for either a screening or stabilization EMTALA claim, a plaintiff must also demonstrate (3) a causal link between the hospital's alleged violations and the harm suffered. More specifically, a plaintiff must show "personal harm" that is a "direct result" of the hospital's EMTALA violation, as contrasted with harm attributable to the underlying condition for which the plaintiff initially sought treatment. *See* 42 U.S.C. § 1395dd(2)(a); *Romine v. St. Joseph Health Sys.*, 541 F. App'x 614, 618 (6th Cir. 2013) ("As EMTALA is essentially a tort action, a plaintiff bears the burden of proving causation at trial."); *Scott v. Mem'l Health Care Sys., Inc.*,

660 F. App'x 366, 372 (6th Cir. 2016) (holding causation is necessary element for both screening and stabilization claims under EMTALA).

Although Plaintiff contends that Dr. Prall made several comments suggesting she was biased against individuals who attempt suicide, thus providing evidence of an improper motive, Plaintiff has offered no evidence whatsoever that the screening he received was substandard compared to the screening offered to non-suicidal patients (or indeed to any other patient). Plaintiff relies on Defendant's policy on "Identification and Management of the At-Risk Psychiatric Patient in the Emergency Department" in his memorandum in opposition (ECF No. 82-2, PAGEID #1001–10), but identifies no discrepancies between this policy and his screening experience. The policy provides that if a patient exhibiting suicidal ideation is determined to be at risk (e.g., due to "verbal threats and/or direct purposeful actions taken by a person to . . . end his/her own life"), precautions must be taken, primarily consisting of placement in "preferred psychiatric area in the ED" and continuous observation. (*Id.* at PAGEID #1001–02.) Plaintiff admits that upon admission, he was placed in a "safe room," and he does not dispute Dr. Prall's assertion that he was under the continuous supervision of MCI staff. (Tipton Decl. ¶ 8, ECF No. 82; Prall Aff. ¶ 8, ECF No. 62-4.)[3] Thus, having failed to identify a genuine issue of material fact as to whether his screening was substandard, Plaintiff cannot succeed on his screening claim. *See Cleland*, 917 F.2d at 272 (noting that a hospital providing a substandard medical screening may be liable under EMTALA, but "[i]f [the hospital] acts in the same manner as it would have for

---

[3] Plaintiff further relies on Defendant's policy titled, "Patient Classification in the Emergency Department" (ECF No. 82-2, PAGEID #1011–14); however, this policy by its terms relates only to patient classification that is performed "[a]fter patient care has been completed." (*Id.* at PAGEID #1011.) This policy therefore has no relevance to screening under EMTALA.

the usual paying patient, then the screening provided is 'appropriate' within the meaning of the statute").

Plaintiff's inability to demonstrate that his screening was substandard is fatal to his screening claim, but even if he could satisfy this threshold requirement, he cannot satisfy the causation element. Plaintiff's allegations as to the specific harm he suffered as a direct result of Defendant's actions are somewhat unclear. Although he alleges ongoing abdominal and wrist pain, his chief complaints appear to be outrage at the idea that a physician would let a suicidal patient assist in his own medical procedure and discharge someone who expressed intentions of suicide. In other words, Plaintiff argues that Defendant violated EMTALA by placing him in a position where he *could have* come to harm. But he does not provide evidence or even any clear allegations on which a reasonable jury could rely to conclude that any actions taken by Defendant *in fact* caused him harm, as required by EMTALA's causation element. *See* 42 U.S.C. § 1395dd(2)(a). For this additional reason, Defendant is entitled to judgment as a matter of law on this claim.

It is therefore **RECOMMENDED** that the Court **GRANT** summary judgment to Defendant on Plaintiff's screening claim.

### 2. Stabilization Claim

To succeed on an EMTALA stabilization claim under sections (b) and (c), a plaintiff must prove that the hospital (1) had actual knowledge of his emergency medical condition and (2) discharged him without stabilizing it. *Cleland,* 917 F.2d. at 271. EMTALA defines an "emergency medical condition" as

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>
> (i) placing the health of the individual . . . in serious jeopardy,

15

    (ii) serious impairment to bodily functions, or

    (iii) serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A). "Stabilized" means "that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." § 1395dd(e)(3)(B). The definition of "transfer" includes the "discharge" of a patient. § 1395dd(e)(4).

  Here, Plaintiff may have presented at Grady Memorial with one or more emergency medical conditions, *i.e.*, his wrist and abdominal lacerations and threats of further self-harm. But even assuming *arguendo* that Plaintiff could establish the existence of an emergency medical condition when he arrived, Plaintiff has not offered evidence that Defendant's physicians failed to stabilize his condition prior to discharge. Rather, the facts as averred by Plaintiff demonstrate that he was stable upon discharge. It is undisputed that his lacerations were cleaned and dressed, that repeated abdominal examinations and repeated x-rays did not conclusively reflect the presence of a foreign body, and that Plaintiff was discharged under the continuous supervision of four corrections officers back to MCI, where he was seen regularly by mental health professionals. Though he complained of bleeding, ongoing abdominal pain, the remaining presence of a foreign object in his abdomen, and difficulties using his wrist, these complaints do not establish that his condition was unstable. Further, Plaintiff has not averred that his condition worsened or that he was in emergent distress until he again attempted suicide on January 30, 2020—five days after Dr. Prall discharged him. Defendant is therefore entitled to judgment as a matter of law on this claim.

  The undersigned further notes that Plaintiff's stabilization claim also includes the same causation element required by screening claims. 42 U.S.C. § 1395dd(2)(a). *Scott*, 660 F. App'x

16

at 372. For the same reasons discussed in relation to Plaintiff's screening claim, Plaintiff's inability to establish causation is also fatal to his stabilization claim.

It is therefore **RECOMMENDED** that the Court **GRANT** summary judgment to Defendant on Plaintiff's stabilization claim.

### III. DISPOSITION

For the foregoing reasons, Plaintiff's Motion for Zoom Conference, Motion to Appoint Counsel, Motion to Appoint Medical Expert, Motion for Additional Discovery under Federal Rule of Civil Procedure 56(d), and Motion to Compel Further Discovery Responses (ECF Nos. 68, 69, 80) are **DENIED**, and it is **RECOMMENDED** that Defendant's Motion for Summary Judgment (ECF No. 62) be **GRANTED**. The undersigned notes that a filing containing several of Plaintiff's Motions (ECF No. 68) also contains Plaintiff's objection to the undersigned's prior Order of April 12, 2022 (ECF No. 59); thus, the portion of ECF No. 68 comprising Plaintiff's objection (PAGEID #808–11) remains pending for review by the District Judge.

### PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A Judge of this Court shall make a *de novo* determination of those portions of the Report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE